# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs January 16, 2013

## STATE OF TENNESSEE v. RUBY W. GRAHAM

**Appeal from the Circuit Court for White County**
**No. CR3849      Leon C. Burns, Jr., Judge**

---

**No. M2012-00674-CCA-R3-CD      Filed 05/28/2013**

---

The defendant, Ruby W. Graham, appeals her White County Circuit Court jury convictions of attempt to possess with the intent to sell morphine, oxycodone, and marijuana, challenging the sufficiency of the convicting evidence and the total fine imposed. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and PAUL G. SUMMERS, SR. J., joined.

Howard L. Upchurch and Justin C. Angel, Pikeville, Tennessee, for the appellant, Ruby W. Graham.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Assistant Attorney General; Randall A. York, District Attorney General; and Philip A. Hatch, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant's convictions relate to events that occurred on April 3, 2009. On that day, Tennessee Bureau of Investigation ("TBI") Special Agent Danny Espinosa and other officers executed a search warrant at the defendant's residence. Agent Espinosa testified that as he approached the door of the residence, he observed "a video surveillance camera hanging . . . around the doorway." He knocked on the door, and the defendant's son answered. After presenting his credentials and announcing the reason for his presence, Agent Espinosa entered the residence. The defendant, her son, her son's girlfriend, and the defendant's father were all inside the residence. The defendant, who was in a wheelchair,

and the defendant's elderly father were allowed to remain where they were while the other occupants were ordered to the floor.

Agent Espinosa testified that he asked the defendant to get out of the wheelchair and sit in a "little wooden chair" so that officers could search the wheelchair. The defendant complied but "she had her legs clinched from her knees all the way up, kind of taking real small shuffle steps." The defendant's odd gait drew Agent Espinosa's attention, and he asked one of the female officers to search the defendant's person. The defendant was moved back into the wheelchair, wheeled down the hall, and helped into another chair. Each time she moved from chair to chair, the defendant "did the same thing, clinched her legs, real small shuffle steps." Agent Espinosa said that when the defendant sat in the wooden chair for a second time, "she reached down under her leg and said, 'Here you go,' and handed [Agent Espinosa] a small little Ziploc baggy with six blue tablets." Agent Espinosa said that the packaging of the pills in the baggy rather than in a medication bottle indicated that the pills were "packaged for resale at that point." The pills were sent to the TBI laboratory for testing.

In the kitchen of the residence, Agent Espinosa found "a paper sack" that contained "a little black shaving bag." Inside the shaving bag, Agent Espinosa found "hundreds of pills . . . and some marijuana." Agent Espinosa testified that when he questioned the defendant about the bag, "she said that it was her bag." He said that the pills in the bag were packaged in "different medicine bottles, some labeled, some not labeled, some of the labels ripped off, and . . . some bottles [had] two or three different types of medication in there." He added that many of the labeled bottles did not contain medication that matched the label and that none of the bottles was labeled with the defendant's name. Agent Espinosa noted that the packaging was "common for people selling narcotics." He said that some of the pills had actually been cut in half, another indicator that the pills were being sold illegally. He explained, "[W]hen people arrive to purchase prescription medication from them, they may not have enough money, and if the pill is forty dollars ($40), and they only have twenty ($20), they'll typically chop that pill in half, sell half of it for twenty ($20) and keep the other half to sell to somebody different."

Other officers discovered a handwritten sign on a table that said, "Don't knock on the door until the sign is down." Agent Espinosa said that such signs were common in residences utilized in the illegal drug trade, explaining, "A sign like this would be placed so people know when to come and when not to come."

Officers also discovered a monitor for the camera discovered outside the residence by Agent Espinosa. Additionally, officers found "money, and other items of jewelry, and stuff like that, that we'd normally see people take on trade."

During cross-examination, Agent Espinosa testified that he was not aware that the defendant received disability benefits or that she had received a disability check the same day as the search. He also did not know whether the defendant had operated a store at some point before the search.

TBI Agent Harold Eaton testified that he assisted in the collection of the pills and medication bottles from the defendant's residence and sent the items to the TBI laboratory for forensic testing. Agent Eaton testified that he discovered a nine-inch television monitor and a police scanner in the kitchen of the defendant's residence. Agent Eaton said that the packaging of the marijuana found inside the black shaving bag was consistent with its being possessed for resale. He said that a pill cutter found inside the bag and a calculator adjacent to the bag indicated that the pills were being sold. In the defendant's bedroom, Agent Eaton discovered $1132 cash "in small increments."

TBI Agent and Forensic Scientist Laura Adams testified that she received the evidence forwarded to the TBI laboratory by Agent Eaton and subjected it to forensic testing. Her testing identified a total of 43 morphine tablets, 16 oxycodone tablets, and 7.3 grams of marijuana.

Howard Swoape testified on behalf of the defendant that in April 2009 he lived at 5266 McMinnville Highway and that the address listed on the search warrant executed on April 3, 2009, was 5288 McMinnville Highway. He and the defendant owned the building and residence located at 5266 McMinnville Highway, but he was the only person living there in April 2009. The defendant, he said, was living with her elderly father in Van Buren County. Mr. Swoape testified that the defendant had a car accident in 2007 that "left her crippled" and confined to a wheelchair. He said that the defendant only came to the McMinnville Highway residence to "take a bath and stuff and get ready" to go to doctors' appointments. He said that the defendant's son also stayed at the residence on occasion, as did Brooke Hopkins. Additionally, Jimmy Jack Walker "used the bottom to take a shower and stuff like that."

Mr. Swoape testified that in April 2009, the defendant received $1300 in monthly disability benefits and that he assisted the defendant in cashing her check and paying her bills. He said that the defendant received her disability check on April 3, 2009, and he cashed the check at a White County bank. He "paid part on a light bill" that was approximately $200 and returned $1100 to the defendant. He said that the $1100 "was broke up in all different kinds of money, because . . . [he'd] give [their] granddaughter some change" when he dropped her at school.

Mr. Swoape testified that in April 2009 he was prescribed hydrocodone and

that the defendant "had to take an awful lot of medication" due to the injuries she received in the accident. In addition to their own medication, Mr. Swoape and the defendant "took care of" medication for the defendant's father, Brooke Hopkins, and Rhonda Caldwell. According to Mr. Swoape, they did so because those individuals were "having problems with [their medication] getting stolen." He said that the defendant used the pill cutter seized by officers "to cut her blood pressure pills." Mr. Swoape testified that the defendant carried all the medication and the pill cutter in a black shaving bag. He denied that the bag also contained marijuana.

Mr. Swoape testified that he purchased the scanner because he "just liked to listen to it." The video camera, he said, had been affixed to the porch by Tim Caldwell as "a decoy, because we'd had some prowlers out in the parking lot." He insisted that neither the scanner nor the camera was working on April 3, 2009.

During cross-examination, Mr. Swoape insisted that he could remember the precise amount of the defendant's April 2009 disability check, the amount he deducted from it to pay an electric bill, and the denominations in which he returned the cash to her. He conceded that the defendant came to the McMinnville Highway residence nearly every day. He also conceded that the black bag containing the drugs belonged to the defendant.

Rhonda Caldwell testified that her doctor prescribed morphine for pain and that she was taking the drug in April 2009 along with oxycodone. She said that she left both medications in the defendant's McMinnville Highway residence because two of her family members had stolen her medication "about ten times." She said that after filling the prescriptions she "would take them straight to [the defendant]." Ms. Caldwell said that she traveled to either the McMinnville Highway residence or the defendant's father's residence "every two or three days" to retrieve her medication. Ms. Caldwell said that when the defendant ran short on time, she put "two or three days" worth of medication into a plastic bag for Ms. Caldwell. She testified that six morphine pills was three days' dosage.

During cross-examination, Ms. Caldwell said that on April 3, 2009, she telephoned the defendant and told the defendant that she was coming to get her medication. She testified that she arrived at the defendant's residence "two minutes" later and saw "all the cops and stuff," so she kept going and did not stop.

Melody Brooke Hopkins testified that she stayed at the defendant's McMinnville Highway residence "three to four days a week" in April 2009. At that time, Ms. Hopkins was taking hydrocodone, alprazolam, and oxycontin, and she allowed the defendant to keep those medications for her because she feared she "would end up getting them stolen." She said that she left the McMinnville Highway residence on the morning of

April 3, 2009, before officers arrived. Ms. Hopkins said that before leaving, she placed "a twenty bag" of marijuana into the defendant's black bag. She said that a "twenty bag" weighed "[a]bout 4, 4.7 grams." She said that she did not tell the defendant that she put the marijuana into the bag.

Joshua Graham, the defendant's 25-year-old son, testified that in April 2009 the defendant lived with her father on Cane Creek Road in Van Buren County. He was present when officers arrived to execute the search warrant on April 3, 2009. Mr. Graham claimed that the defendant kept medication for her father, Ms. Caldwell, Ms. Hopkins, and Mr. Swoape. Mr. Graham said that the security camera was pointed "towards the back part" of the parking lot where some "junk cars" were parked. He said that the camera was not on when police arrived. He said that the scanner, which he described as "an antique," was not on either. He said that the defendant kept all medication in a black bag that she kept in a safe inside the McMinnville Highway residence.

During cross-examination, Mr. Graham insisted that, despite his testimony that the defendant kept her medication inside the safe at the McMinnville Highway residence, she did not stay or live there.

Following a *Momon* colloquy, *see Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn. 1999), the defendant elected not to testify.

Based upon this proof, the jury convicted the defendant of the lesser included offenses of attempted possession with intent to sell morphine, oxycodone, and marijuana.

As an initial matter, we must address the timeliness of the defendant's notice of appeal. Although no copy of the defendant's motion for new trial was included in the record on appeal, defense counsel stated at the hearing on the motion for new trial that the motion was placed in the mail on May 12, 2011. The record does contain a copy of the State's response, which was filed on June 6, 2011. A set of judgment forms filed on June 1, 2011, does not bear the signature of the trial judge; judgments filed on June 9, 2011, are signed. *But see State v. Hatcher*, 310 S.W.3d 788, 799 (Tenn. 2010) (noting that the rules of criminal procedure "clearly contemplate that the trial court will conduct the sentencing hearing and enter the uniform judgment order *before* any motion for new trial is filed" (emphasis in original)). Both sets of judgments include a sentence imposition date of April 26, 2011, which is confirmed by the sentencing hearing transcript. From this evidence, we surmise that the defendant filed a timely motion for new trial, *see Hatcher*, 310 S.W.3d at 800, and the State does not suggest otherwise. We note that our adjudication of the defendant's issues, sufficiency of the evidence and sentencing, is not dependent upon a motion for new trial being filed. *See* Tenn. R. App. P. 3(e).

A hearing on the motion for new trial occurred on January 24, 2012. At the conclusion of the hearing, the trial court denied the defendant's motion for a new trial but granted limited relief by declining to impose one of the $50,000 fines fixed by the jury. An order signed by the trial judge memorializing these actions was filed that same day. Then, on February 6, 2012, the trial court, for reasons that are unclear from the record, issued a second order purporting to deny the motion for new trial and reduce the defendant's total fine. The defendant filed a notice of appeal on March 5, 2012, within 30 days of the second order filed by the trial court but more than 30 days from the January 24, 2012 order. In our view, the trial court's January 24, 2012 order denying the motion for new trial marked the start of the 30-day time period for filing his notice of appeal, *see* Tenn. R. App. P. 4(a), and the notice of appeal filed on March 5, 2012, was untimely.

That being said, "in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." *Id.* In this appeal, the defendant challenges the sufficiency of the evidence, claiming that the testimony of the defense witnesses "clearly explained why the [defendant] had possession" of the drugs and other items seized during the search of the residence, and the imposition of a $52,500 fine, claiming that the fine was unconstitutionally excessive.

*Sufficiency*

We review the defendant's challenge to the sufficiency of the evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

In her challenge to the sufficiency of the evidence, the defendant essentially asks this court to reweigh the evidence presented at trial and go behind the credibility

determinations of the jury. We are not free to do either. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). The evidence, in the light most favorable to the State, established that the defendant possessed a number of morphine and oxycodone pills that were not prescribed to her and a quantity of marijuana. The presence of a surveillance camera, police scanner, and a large quantity of cash supported an inference that the defendant possessed the drugs for resale. The totality of the evidence clearly supports the defendant's convictions of attempted possession of morphine, oxycodone, and marijuana for resale.

*Fine*

This court reviews fines as a part of the sentence, *see State v. Bryant*, 805 S.W.2d 762, 767 (Tenn. 1991), and our standard of review is abuse of discretion, *see State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The trial court's imposition of a fine should be based upon the factors and principles of the 1989 Sentencing Act, such as prior history, potential for rehabilitation, financial means, and mitigating and enhancing factors relevant to an appropriate, total sentence. *See Bryant*, 805 S.W.2d at 766. Although the defendant's ability to pay is a factor for the trial court to weigh in reviewing the fine fixed by the jury, *see State v. Alvarado*, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996), it is not the controlling factor. "An oppressive fine can disrupt future rehabilitation and prevent a defendant from becoming a productive member of society. . . . However, a significant fine is not automatically precluded just because it works a substantial hardship on a defendant - it may be punitive in the same fashion incarceration may be punitive." *State v. Marshall*, 870 S.W.2d 532, 542 (Tenn. Crim. App. 1993).

The defendant's claim that the fine imposed was excessive rests on her declaration that she is unable to pay the fine from "her meager social security check" and because she "has severe medical limitations." The trial court heard this same proof regarding the defendant's ability to pay and reduced the $102,500 fine fixed by the jury, choosing to impose a fine of $52,500 based upon its conclusion that the defendant had the ability to pay the lower fine. We cannot say that the defendant has demonstrated entitlement to a further reduction.

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE